MADISON McAFEE, Auditor, &c. *v.* THE SOUTHERN RAILROAD CO.

1. THREE PER CENT. FUND: ACT OF 1852 CONSTRUED.—The Act of the 16th of March, A.D. 1852 (Session Laws, p. 91), does not absolutely grant the three per cent. fund, then in the State treasury, to the several counties in this State, but the appropriation therein made is a mere delegation by the legislature of the power to the counties to expend the fund in execution of the trust imposed by the terms of the grant made by Congress to the State, and is therefore subject to be resumed at the pleasure of the State, at any time before the actual reception or appropriation of the money by the counties.

2. STATUTES: REPEAL BY IMPLICATION NOT FORMED.—The law does not favor a

repeal by implication ; and hence, when two statutes are seemingly repugnant, they must be so construed, if possible, that the latter shall not be a repeal of the former by implication.

3. SAME: CONSTRUCTION OF GENERAL WORDS IN.—General words in a statute should never be so construed as to divest a right clearly granted by a previous statute, if they be susceptible of a fair construction consistent with the right there granted.

4. THREE PER CENT. FUND: ACTS OF 1852 AND 1857 CONSTRUED.—The Act of the 16th of March, 1852, granted all the three per cent. fund then in the State treasury, to the several counties of the State ; the Act of the 18th November, 1857, granted all of that fund then in the treasury to the five railroad companies therein named, without making an express reference to the former act. A large sum which was in the treasury at the date of the first act was never in fact distributed to the counties, but remained in the treasury at the date of the Act of 1857, together with a large sum which had been received as a part of the three per cent. fund, since the passage of the Act of 1852. Held, that as there was no express repeal of the Act of 1852 contained in the Act of 1857, the general words of the latter act did not divest the right of the counties secured by the first act, and that the two acts should be so construed as to give effect to both of them ; and therefore, that the Act of 1857 did not· embrace any portion of the fund granted to the counties by the Act of 1852.

5. SAME: ACT OF 1857: RIGHT OF SOUTHERN RAILROAD COMPANY TO A PART OF THE FUND NOT ON AUDITOR'S BOOKS.—The Act of the 18th November, A.D. 1857, which loaned the three per cent. fund then in the treasury in equal shares to five railroad companies therein named, upon their making application to the auditor within ninety days from its date, also provided, that if any of said companies should "fail or refuse for ninety days to make application for their distributive share, then the share or shares so neglected or refused to be applied for," should "be distributed by the auditor of public accounts to the other road or roads applying within the ninety days, share and share alike." All the companies applied for and received their distributive shares of the sum shown by the auditor's books, and recognized by that officer as belonging to the three per cent. fund. The defendant in error (being one of the companies), just before the expiration of the ninety days, applied for a further sum, which, upon subsequent investigation, was found to belong to that fund. Held, that the failure of the other companies to apply within the ninety days for the said sum not recognized by the auditor as belonging to the fund, was not, under the circumstances, a forfeiture of their right in it, as such failure was without fault on their part, and occasioned by mistake of fact over which they had no control.

6. SAME: SAME: HOW APPLICATION FOR LOAN MADE UNDER ACT OF 1857.—The application required by the Act of the 18th November, 1857, to be made within ninety days after its passage by the several railroad companies therein named, for a loan of the three per cent. fund, must be made to the auditor of public accounts, a deposit of bond with the treasurer within that time, and an application afterwards to the auditor for his warrant will not do.

McAfee *v.* Southern Railroad Co.

ERROR to the Circuit Court of Hinds county. Hon. John Watts, judge.

*T. J. Wharton*, attorney-general, for the plaintiff in error.

*Yerger* and *Rucks*, for defendant in error.

*W. P. Harris*, on same side.

HANDY, J., delivered the opinion of the court.

This was a mandamus, issued on the petition of the Southern Railroad Company, commanding the auditor of public accounts to issue his warrant on the State treasury for an amount of money alleged to be in the treasury, and to which the railroad is entitled.

The petition states, in substance, that by an act of the legislature, passed on the 18th November, 1857, it was enacted that the three per cent. fund, then in the treasury, should be loaned in equal portions to the Southern Railroad, and four other named railroad companies; and that before receiving any portion thereof the said companies should deposit in the treasury, their bonds to the amount of such ratable share as they might be entitled to, payable to the State, &c.; and that the auditor should be required, on the presentation of the certificate of the treasurer, that any of said companies had deposited their bonds in accordance with the requirements of the act, to issue his warrant on the treasury for one-fifth part of said fund; and it was further provided by said act, that if either of said companies shall fail, or refuse for ninety days, to make application for their distributive share of said fund, then, and in that event, that the share or shares so neglected or refused to be applied for, should be distributed among the other road or roads applying within the ninety days, share and share alike.

The petition further states, that in accordance with this act, each of the companies applied for and received from the fund, the sum of $20,949 07, except the New Orleans, Jackson, and Great Northern Railroad, which applied for and received only the sum of $20,000; that when this act took effect, there was in the State treasury, belonging to the three per cent. fund, the sum of

$211,983 33, as shown by the books of the auditor; and by the report of A. H. Arthur, a commissioner appointed to examine into the condition of the fund, there was then in the treasury, belonging to the fund, $209,176 89.    The applications and bonds of the several companies for the sums received by them respectively, as above stated, are exhibited with the petition, showing that the sums applied for and received by them from the fund, amounted to the sum of $103,796 28 ; and that these sums were applied for and received by the several companies named in the act, within the time specified in the act.

The petition further alleges, that there remained in the treasury, not applied for nor paid out of the fund, $113,928 85, according to the report of Arthur, and $111,122 41, according to the auditor's books, on the 15th February, 1858 ; and on that day, that the Southern Railroad Company deposited in the treasury five bonds of the company, each for the sum of $20,000, dated 15th February, 1858, payable to the State six years after date, duly executed according to the provisions of the act of the legislature aforesaid, thereby entitling that company to receive $100,000 of the three per cent. fund remaining in the treasury, in addition to the sum of $20,949 07, previously received by that company ; the amount thus claimed not having been called for, or claimed by any other of the companies named in the act, within ninety days from the passage of the act ; and, on the 15th February, 1858, that the Southern Railroad Company made application, in writing, to the treasurer, for $97,655 97, part of the said fund ; and after that date, that he applied to the auditor of public accounts for a warrant upon the treasury for the same sum, presenting the certificate of the treasurer ,showing that the company had deposited in the treasury its five bonds, amounting to $100,000, as above stated ; but that the auditor refused to issue his warrant.

The answer of the auditor, after admitting the greater part of the facts stated in the petition, denies that the petitioner complied with all the requirements of the Act of 18th November, 1857, so as to entitle the company to the sum of money claimed ; and states that the company did not apply to the auditor within ninety days from the date of that act, for a warrant for the sum claimed, or any part thereof, and that no such application was made, or notice

thereof given to the auditor, until the 27th November, 1858. He admits that on that day, the petitioner presented to him the certificate of the treasurer, in relation to the deposit of five bonds in the treasury, amounting to $100,000, and that he refused to issue his warrant thereupon, upon the following grounds: 1st. That the petitioner did not, at any time, within ninety days of the passage of the Act of 18th of November, 1857, apply to the auditor to issue his warrant for the amount claimed. 2d. That the legislature, by an act passed 16th March, 1852, distributed, or ordered to be distributed, among the several counties of the State, the amount of the three per cent. fund then in the treasury, or that might accrue by the 1st April, 1853; and that at the date of the passage of said act, that the books in the auditor's office did not show that there was, to the credit of the three per cent. fund, the sum shown by the books of James E. Matthews, former auditor, to belong to that fund, amounting to about $103,000; that sum having been rejected, as not belonging to the fund, by the several successors of Matthews; and the sum appearing to the credit of the fund, being composed of the amounts received after the expiration of the term of office of Matthews, and that the successors of Matthews made up their books by rejecting the amount stated on the books of Matthews, to belong to the fund; that this course was pursued because there were believed to be errors in the account of Matthews, owing to the confusion in which the three per cent. fund had been involved, by the embezzlement of Richard S. Greaves of a large sum, the amount of which was not ascertained, belonging to that fund; which embezzlement had produced a disagreement in the account of the fund, as shown by the books of the treasurer, and those of the auditor; and that the amount loaned to the railroad companies, was the amount of the fund which had accrued in the treasury, since the passage of the Act of 1852. 3d. That the legislature, on the 3d December, 1838, passed an act, ordering and directing all moneys belonging to the three per cent. fund, then in the treasury, to be distributed to the several counties of the State; and lastly, that the railroad companies, other than the petitioner, named in the Act of 1857, did not apply for warrants for any part of the sum due the fund, according to the books of Auditor Matthews, because they knew the condition of the fund arising from the facts

above stated; and all the said companies, including the petitioner, knew that respondent would not issue his warrant for any part of the sum of $97,655 75, for the reasons above stated, without legislative direction.

Upon the hearing of the cause on the petition and answer, the court ordered the respondent to issue his warrant in favor of the petitioner, for the sum of $97,655 75.

It is insisted, in the first place, in behalf of the plaintiff in error, that by virtue of the Act of 16th March, 1852, the fund in controversy was *vested* in the several counties of the State, it being admitted to be a part of the three per cent. fund then in the State treasury; and that it was not in the power of the legislature, by the Act of 1857, to take away the right so vested in the counties, and to distribute the money to the railroad companies named in that act.

This position would be correct, if the legislature had possessed the power, and had intended, to grant the fund absolutely to the counties. But the State held the fund under grant from the Federal Government, for the purpose of making roads and canals in this State, under the direction of the legislature, and the appropriation of it by the Act of 1852, must be taken to be in furtherance of that object. The grant of the fund to the counties must be considered as a delegation of the power to them, in their corporate capacity, to carry out the purpose, and to execute the trust committed to the legislature, and subject to be resumed whenever the State might deem it necessary and proper, before the fund should be received or appropriated by the counties, to revoke the authority. And hence it was competent for the legislature to repeal the act granting the fund before it was received, or appropriated by the counties, and to make a different disposition of it, in order to accomplish the purposes for which the fund was held by the State.

The question, then, arises, does the Act of 1857 operate as a repeal of the Act of 1852, and give to the railroad companies *the same part* of the three per cent. fund given to the counties by the Act of 1852?

It is to be observed that the Act of 1857 contains no words of repeal of the preceding act, nor any words whatever distinctly referring to the provisions of that act, or clearly showing that the

*same money* embraced in that act was intended to be appropriated by the Act of 1857. We must, therefore, ascertain from the nature and scope of the acts, and the condition and circumstances of the fund which was the subject-matter of legislation, what was the true intent of the legislature in the latter act with respect to the former, and whether both acts cannot stand and take effect as substantive and independent acts, relating to different parts of the same general fund.

The Act of 1852 in express terms provides, that the three per cent. fund *then in the treasury* shall be distributed to the counties; and it is admitted that this gave the right to the counties to receive the part of the fund here in dispute, which was then in the treasury. But it is said that the counties did not receive it, and, as it remained in the treasury undistributed under that act, that the legislature made an appropriation of it under the Act of 1857, loaning to the railroad companies the three per cent. *then in the treasury*.

It will be seen that both acts alike dispose of the fund in the treasury at their respective dates, and that there is no express reference whatever in the latter act to the money disposed of by the former. If the fund referred to in the latter was necessarily that embraced in the former act or a part of it, it cannot be doubted but that the language of the latter act is sufficiently broad to comprehend such part of the fund embraced in the former act as then remained in the treasury undistributed. But if there were distinct parts of the fund upon which each statute could operate, then, in the absence of words in the latter showing a clear intention to take away the right granted by the former, such a construction must be given to them as to preserve the right granted by each, and thus give effect to both statutes. For general words should never be so construed as to divest a right clearly granted, if the words, without a violation of the provisions of the statute, are susceptible of another construction consistent with the right.

It is laid down that "the law does not favor a repeal by implication unless the repugnance be quite plain;" and "although two acts are seemingly repugnant, yet they shall, if possible, have such construction that the latter may not be a repeal of the former by implication." Dwarris, 674. "And a subsequent act which can be

reconciled with a former act shall not be a repeal of it, though there be negative words even." Ib. and *Goldson* v. *Buck*, 15 East. 372.

In this case, it appears that there was a part of the three per cent. fund in the treasury, the same now in dispute, at the time of the passage of the Act of 1852, and a distinct part of that fund in the treasury at the date of the Act of 1857, thus showing a distinct part of the fund upon which each statute could operate. The two statutes appear to be distinct and independent of each other, as to the fund embraced by them, the latter making no reference whatever to the former. By established rules of construction, full effect must be given to each. There is no necessary repugnance between them; and the right granted by each may fairly be satisfied without interfering with the right granted by the other. The words of the latter statute, and, so far as we can interpret it, its spirit, can be satisfied without impairing the fund granted to the counties by the former act. But if we interpret the latter *statute to embrace a part of the fund granted by the former statute,* we presume an intention, not indicated by anything in either of the statutes, and by mere force of general words, to repeal a statute not necessarily repugnant to the one alleged to have the repealing effect, and to take away a right granted by the former statute, by implication, when both statutes may be so construed as to produce no conflict of right. This is not justified by sound principles of construction; and we, therefore, think that the latter statute cannot be held to embrace any part of the three per cent. fund granted to the counties by the Act of 1852.

This view is strengthened by the consideration, that the legislature passed the Act of 3d December, 1858, treating the fund here in dispute as then subject to distribution, and as "never having been actually distributed either among the counties or among the railroads," and providing that it should be loaned and disposed of in a different manner from what was authorized by the two preceding acts. This goes to show one of two things: 1st. The legislative consideration as to the intent in passing the two preceding acts, and with respect to the parts of the fund granted thereby to the counties and to the railroad companies respectively; or, 2d. That the sum mentioned in the last act, being that here in dispute, had not been

appropriated according to the true intent of the Act of 1857, even if it was embraced within the terms of that act.

Although it is not competent for the legislature to adjudicate the rights of private persons which have become vested under previous legislation or by subsequent acts to take away rights so vested, yet it is proper for courts, in construing such statutes and in determining such rights, to consider the several acts of the legislature touching the subject-matter, in order to ascertain what was the legislative intent, in the several acts. When we look to the Act of 1858, we find it irreconcilable with the idea that a vested right to the fund here in controversy was granted to the railroad companies by the Act of 1857, because its provisions would impair such a right. It is not to be supposed that the legislature intended to interfere with such right; and yet it is plain that they have made a disposition of the fund, alleged to be embraced in the Act of 1857, different from the provisions of that act. We are not to give to the Act of 1858, a construction which would make it unconstitutional, but if possible it should be so construed with reference to the other acts, as to render it constitutional and give it effect; and such character and effect are given to it, by considering the fund here in controversy, and which was the subject of its provisions, as not embraced in the provisions of the Act of 1857. In this view, the Act of 1858 is constitutional, and serves to show that this fund was not intended to be vested in the railroad companies by the Act of 1857; otherwise the act would be unconstitutional.

Upon the second point, let us consider the provisions of the Act of 1857, granting that it embraced the fund here in controversy. By the first section, the three per cent. fund then in the treasury, was loaned to the five railroad companies named. The second section requires that, before receiving any portion of the fund, they should deposit in the State treasury their bonds for the "*ratable share to which they may be entitled.*" The third section requires the auditor, " on the presentation of the certificate of the treasurer, that any of said companies have deposited their bonds in accordance with the requirements of the act, to issue his warrant on the treasurer in favor of such company, for *one-fifth part of said three per cent. fund.*" . . . . Provided " that should either of the roads fail or refuse for ninety days to make application for their

distributive share of the three per cent. fund, then and in that event, the share or shares so neglected or refused to be applied for, shall be distributed by the auditor of public accounts among the other road or roads applying within the ninety days, share and share alike."

It appears that each of the named companies, within the ninety days, deposited their bonds with the treasurer, for the ratable share of the fund which they supposed to be in the treasury, and received the amount of the fund to which they were believed by the auditor to be entitled. They did not make their application for a larger amount, because they knew that, as the account of the fund stood on the books of the auditor, he would not issue his warrant for a larger amount, or for any part of the sum now in controversy, the same not appearing by the books of the department to be due. All the companies, including the petitioner, came in and made their application for their shares of the fund, upon the basis of the auditor's account; and after having done so, the petitioner afterwards, and when the ninety days' time was about to expire, made application to the treasurer for the sum now claimed.

Thus all parties acquiesced in the account of the auditor, and filed their applications and received their share accordingly. In doing so they were misled by an error in the books of the auditor's department, a mistake of fact beyond their control. Should the petitioner, under such circumstances, by her subsequent application to the treasurer, take the benefit of the entire fund which was denied the other companies? We think clearly not.

1st. All the parties having made their application to the auditor, and taken their shares upon the basis of the auditor's account, the failure to make application for the balance of their shares of the fund, is not a relinquishment of their equitable right to it, within the spirit of the statute, so as to leave it subject to distribution to the petitioner. The contingency upon which the distribution was to be made by the auditor manifestly was, that some of the companies should fail or refuse to accept the loan, and take the shares to which they were entitled under the act. This contemplated a failure to take any part of the fund offered to them, and not an application which was ineffectual without any fault on their part. And although the application for a part of the fund, did not give

McAfee *v.* Southern Railroad Co.

them the right in law to the balance, yet inasmuch as they were prevented, by the action of the auditor, from applying for their entire ratable shares, their application for such portion as they could receive, would, under the circumstances, show a willingness to accept the loan, and would be a good reason why they should not forfeit the balance which they were prevented from receiving. Under such circumstances, and as the terms of the statute were not strictly complied with by any of the parties, if this fund was embraced by the statute, it was competent for the legislature to treat the rights of the other companies as not forfeited, to give them further indulgence, or to make other provisions for their benefit.

2d. After the application by all the companies, recognizing the auditor's account, and receiving their shares in accordance with it, the other companies were justified in acting upon the belief, that no other claim would be made by any of them for the balance alleged *to be due; and to give effect to such subsequent application* by the petitioner, under the circumstances of the case, would be to allow an undue advantage, not justified by the general spirit of the act.

3d. It appears that the petitioners did not make their application for the fund here claimed *to the auditor*, until more than twelve months after the passage of the act. It is true the application was made to the treasurer, and the bonds of the company were deposited in the treasury within ninety days after the passage of the act. The act appears clearly to contemplate that the application shall be made *to the auditor* within the ninety days. The bonds to the amount of the distributive share are required to be filed with the treasurer, who is to give to the company a certificate of the fact. But that certificate is to be presented to the auditor, who is thereupon required to issue his warrant on the treasury in favor of the company, for one-fifth part of the fund; but if either of the companies should fail, for ninety days, to make application for their distributive shares, then such share or shares should be *distributed by the auditor* among the other road or roads, applying within the ninety days. Thus the application for the warrant for the distributive share is to be made to the auditor, he is to issue his warrant thereupon for one-fifth part of the fund at all events, and if any

share should not be applied for within ninety days, the same should be distributed by him to such other roads as did apply within that time.    From this it is clear that the application was to be made *to him* within the ninety days, by presenting to him the treasurer's certificate for the full amount claimed by the company.    For after that time, he is required to make distribution of any share or shares not applied for within that time, *to such as did apply within the time.*    How was he to know to whom to make such distribution after ninety days, unless the parties claiming it had made application, by presenting to him their certificates, before the expiration of the ninety days?    Suppose all the companies had filed their bonds in the treasury, and obtained their certificates for the full amount of their respective shares, and but one of them had presented her certificate to the auditor within ninety days; when the auditor proceeded to make distribution after the ninety days, to whom must he make it?    Certainly to the company which had presented its claim *to him within the ninety days.*    For he could not recognize any other as entitled, than the company which had made application and presented its certificate to him.    He could not take notice of bonds filed in the treasury, and must have a voucher in his own office, to justify his making distribution, or issuing his warrant.

Therefore the filing of the petitioner's bonds in the treasury, on the 15th February, 1858, without the presentation of the certificate to the auditor within the ninety days, gave the petitioner no right to demand the residue of the fund, to the exclusion of the other companies.

Upon any view of the subject, we are satisfied that the claim cannot be maintained; and the judgment must be reversed, and the petition dismissed.

SMITH, C. J., dissented from the above opinion.

A petition for a reargument was filed, but refused.